**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| LORRIE R., | ) No. CV 19-5406-PLA |
| Plaintiff, | ) **MEMORANDUM OPINION AND ORDER** |
| v. | ) |
| ANDREW M. SAUL, COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | ) |
| Defendant. | ) |

**I.**

**PROCEEDINGS**

Lorrie R.[1] ("plaintiff") filed this action on June 20, 2019, seeking review of the Commissioner's denial of her applications for a period of disability and Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") payments. The parties filed Consents to proceed before a Magistrate Judge on June 27, 2019, and July 19, 2019. Pursuant to the Court's Order, the parties filed a Joint Stipulation (alternatively "JS") on January 27, 2020, that

---

[1] In the interest of protecting plaintiff's privacy, this Memorandum Opinion and Order uses plaintiff's (1) first name and last initial, and (2) year of birth in lieu of a complete birth date. See Fed. R. Civ. P. 5.2(c)(2)(B), Local Rule 5.2-1.

addesses their positions concerning the disputed issues in the case. The Court has taken the Joint Stipulation under submission without oral argument.

## II.

## **BACKGROUND**

Plaintiff was born in 1957. [Administrative Record ("AR") at 863, 870.] She has past relevant work experience as a home attendant, and in the composite job of swimming pool servicer and sales clerk. [Id. at 26, 769.]

On July 16, 2015, plaintiff filed an application for a period of disability and DIB and an application for SSI payments, alleging in both that she has been unable to work since December 31, 2011. [Id. at 16; see also id. at 861-69, 870-75.] After her applications were denied, plaintiff timely filed a request for a hearing before an Administrative Law Judge ("ALJ"). [Id. at 805.] A hearing was held on October 10, 2017, at which time plaintiff appeared represented by an attorney, and testified on her own behalf. [Id. at 742-78.] At the hearing, plaintiff amended her alleged onset date of disability to October 9, 2009. [Id. at 16, 745-46.] A vocational expert ("VE") also testified. [Id. at 769-77.] On March 9, 2018, the ALJ issued a decision concluding that plaintiff was not disabled prior to April 1, 2012 (thereby denying her claim for DIB), but became disabled on that date and has continued to be disabled through the date of the decision. [Id. at 16-28; see also JS at 2.] Plaintiff requested review of the ALJ's decision by the Appeals Council. [AR at 860.] When the Appeals Council denied plaintiff's request for review on May 1, 2019 [id. at 1-5], the ALJ's decision became the final decision of the Commissioner. See Sam v. Astrue, 550 F.3d 808, 810 (9th Cir. 2008) (per curiam) (citations omitted). This action followed.

## III.

## **STANDARD OF REVIEW**

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits. The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards. Berry v. Astrue, 622

F.3d 1228, 1231 (9th Cir. 2010) (citation omitted).

"Substantial evidence . . . is 'more than a mere scintilla[,]' . . . [which] means -- and means only -- 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Biestek v. Berryhill, 139 S. Ct. 1148, 1154, 203 L. Ed. 2d 504 (2019) (citations omitted); Revels v. Berryhill, 874 F.3d 648, 654 (9th Cir. 2017). "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." Revels, 874 F.3d at 654 (internal quotation marks and citation omitted). However, the Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." Id. (quoting Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir. 2014) (internal quotation marks omitted)). The Court will "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." Id. (internal quotation marks and citation omitted); see also SEC v. Chenery Corp., 318 U.S. 80, 87, 63 S. Ct. 454, 87 L. Ed. 626 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.").

## IV.

## **THE EVALUATION OF DISABILITY**

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at least twelve months. Garcia v. Comm'r of Soc. Sec., 768 F.3d 925, 930 (9th Cir. 2014) (quoting 42 U.S.C. § 423(d)(1)(A)).

**A.    THE FIVE-STEP EVALUATION PROCESS**

The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920; Lounsburry v. Barnhart, 468 F.3d 1111, 1114 (9th Cir. 2006) (citing Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999)).

In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim is denied. Lounsburry, 468 F.3d at 1114. If the claimant is not currently engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, a finding of nondisability is made and the claim is denied. Id. If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. § 404, subpart P, appendix 1; if so, disability is conclusively presumed and benefits are awarded. Id. If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient "residual functional capacity" to perform her past work; if so, the claimant is not disabled and the claim is denied. Id. The claimant has the burden of proving that she is unable to perform past relevant work. Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992). If the claimant meets this burden, a prima facie case of disability is established. Id. The Commissioner then bears the burden of establishing that the claimant is not disabled because there is other work existing in "significant numbers" in the national or regional economy the claimant can do, either (1) by the testimony of a VE, or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R. part 404, subpart P, appendix 2. Lounsburry, 468 F.3d at 1114. The determination of this issue comprises the fifth and final step in the sequential analysis. 20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 721, 828 n.5 (9th Cir. 1995); Drouin, 966 F.2d at 1257.

**B.    THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since

October 9, 2009, the alleged onset date.[2] [AR at 18.] At step two, the ALJ concluded that since the alleged onset date, plaintiff has the severe impairments of left carpal tunnel syndrome, status-post carpal tunnel release; degenerative disc disease of the cervical and lumbar spine, status-post cervical spinal surgery April 2017; heart palpitations; and anxiety disorder. [Id. at 19.] At step three, the ALJ determined that plaintiff does not have an impairment or a combination of impairments that meets or medically equals any of the impairments in the Listing. [Id.] The ALJ found that prior to April 1, 2012, plaintiff retained the residual functional capacity ("RFC")[3] to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b),[4] as follows:

> [L]ifting up to 20 pounds occasionally and 10 pounds frequently, standing and/or walking up to 6 hours in an 8-hour workday, and sitting up to 6 hours in an 8-hour workday, with the following additional restrictions: frequently push and pull with the left upper extremity; frequently handle, finger, and feel with the left upper extremity; and no fast-paced assembly line work.

[Id. at 19-20.] The ALJ further found that beginning on April 1, 2012, plaintiff -- who switched age categories after that date to an "individual closely approaching retirement age" -- retained the RFC to perform the same light work as prior to April 1, 2012, with an additional restriction that "she would likely be absent from work approximately two days per month." [Id. at 23.] At step four, based on plaintiff's RFC and the testimony of the VE, the ALJ concluded that plaintiff is unable to perform her past relevant work as a home attendant, and in the composite job of swimming pool

---

[2] The ALJ concluded that plaintiff met the insured status requirements of the Social Security Act through December 31, 2011. [AR at 18.]

[3] RFC is what a claimant can still do despite existing exertional and nonexertional limitations. See Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989). "Between steps three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which the ALJ assesses the claimant's residual functional capacity." Massachi v. Astrue, 486 F.3d 1149, 1151 n.2 (9th Cir. 2007) (citation omitted).

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. §§ 404.1567(b), 416.967(b).

servicer and sales clerk. [Id. at 26, 770-71.] At step five, based on plaintiff's RFC, vocational factors, and the VE's testimony, the ALJ found that prior to April 1, 2012, there were jobs existing in significant numbers in the national economy that plaintiff could perform, including work as a "sales clerk" (Dictionary of Occupational Titles ("DOT") No. 290.477-014). The ALJ further found that beginning on April 1, 2012, there are no jobs that exist in significant numbers in the national economy that plaintiff can perform. [AR at 27, 774-75.] Accordingly, the ALJ determined that prior to April 1, 2012, plaintiff was not disabled at any time from the alleged onset date of October 9, 2009, through April 1, 2012, but became disabled on that date and continued to be disabled through March 9, 2018, the date of the decision. [Id. at 28.]

**V.**

**THE ALJ'S DECISION**

Plaintiff contends that the ALJ erred when she: (1) determined that plaintiff is disabled as of April 1, 2012, but not prior thereto[5]; and (2) rejected plaintiff's subjective symptom testimony regarding her functional limitations prior to April 1, 2012. [JS at 3.] As set forth below, the Court agrees with plaintiff, in part, and remands for further proceedings.

**A.    FAILURE TO CALL A MEDICAL ADVISOR TO ESTABLISH DISABILITY DATE**

Plaintiff argues that where, as here, the evidence regarding a disability onset date is not

---

[5] Plaintiff asserts several arguments in connection with this claim: (1) plaintiff's severe medically determinable impairments were the same before and after April 1, 2012; (2) the ALJ determined that plaintiff's RFC beginning April 1, 2012, was identical to her RFC prior to April 1, 2012, with an additional limitation that she would likely be absent from work approximately two days per month, and did not offer any rationale for including this additional finding after, and not prior to, April 1, 2012; (3) the ALJ failed to provide specific and legitimate reasons for discounting the June 2016 opinion of plaintiff's treating physician at Kaiser Permanente, Judy Kim, M.D., who opined that plaintiff was incapable of even a low stress job, would be absent from work more than four times a month and, since 2011, was not able to work on a full-time basis; (4) the ALJ's evaluation of plaintiff's anxiety disorder was "incorrect and incomplete"; and (5) because the evidence regarding plaintiff's disability onset date is not clear from the medical records, the ALJ was required to procure the assistance of a medical expert to render an informed judgment as to that date. [AR at 4-6.] The Court fully considers only one of those arguments herein -- whether the ALJ was required to call a medical expert to determine plaintiff's disability onset date.

clear from the medical evidence, the ALJ "must procure the assistance of a medical expert to render an informed judgment." [Id. at 6 (citing Armstrong v. Comm'r of Soc. Sec., 160 F.3d 587, 590 (9th Cir. 1998)).] She contends that Social Security Ruling ("SSR")[6] 83-20 provides that "for slowly progressive impairments, it is necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process, and requires the ALJ to obtain medical expert assistance in cases where the onset date is not clear from the medical evidence and other pertinent evidence." [Id. at 6-7 (citing SSR 83-20).] Plaintiff notes that the onset of disability is critical in this case to her application for DIB as she was insured for DIB only through December 31, 2011, and the fact that the ALJ found her disabled as of April 1, 2012, meant that she was not entitled to DIB. [Id. at 6.] She argues that "[g]iven the progressive nature" of her impairments, and the substantial medical evidence that those impairments, and the symptoms and limitations associated with the impairments, existed prior to April 1, 2012, the ALJ "committed reversible legal error" by failing to obtain the assistance of a medical advisor to determine the onset date of plaintiff's disability. [Id. at 7.]

Defendant concedes that when medical evidence from the relevant time period is unavailable or inadequate, an ALJ must develop the incomplete record by calling on a medical advisor, but argues that the ALJ has the authority to determine a disability onset date *without* calling a medical advisor where there is a relatively complete medical chronology. [Id. at 8 (citing Wellington v. Berryhill, 878 F.3d 867, 874 (9th Cir. 2017)).] It is only when the record is ambiguous, or "when an incomplete record clearly could support an inference that a claimant's disability began when there were no contemporaneous medical records," that the ALJ must consult a medical advisor. [Id. at 9-10 (citing Wellington, 878 F.3d at 873; see also Diedrich v. Berryhill, 874 F.3d 634, 638 (9th Cir. 2017)).] Defendant notes that plaintiff does not claim that records from the relevant time period prior to her date last insured ("DLI") are missing, or identify

---

[6] "SSRs do not have the force of law. However, because they represent the Commissioner's interpretation of the agency's regulations, we give them some deference. We will not defer to SSRs if they are inconsistent with the statute or regulations." Holohan v. Massanari, 246 F.3d 119, 1202 n.1 (9th Cir. 2001) (citations omitted).

any gaps or ambiguities in the record "that would require a medical expert to unravel the evidence." [Id. at 9.] Defendant states that the record "contains Plaintiff's complete treatment history during the period 2009-17," and the ALJ did not find the evidence ambiguous or the record inadequate. [Id. (citing AR at 971-5939).]

### 1. Legal Standard

The disability onset date is the point at which the claimant is unable to engage in any substantial gainful activity due to a mental or physical impairment that can be expected to last for at least 12 months. 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). "The ALJ is responsible for studying the record and resolving any conflicts or ambiguities in it." Diedrich, 874 F.3d at 638 (citing Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1098 (9th Cir. 2014)). Although the plaintiff has the burden of establishing that she was disabled before her DLI, the ALJ also has a duty to assist in developing the record. Armstrong, 160 F.3d at 589. "[I]n circumstances where the ALJ must determine the date of disability onset and medical evidence from the relevant time period is unavailable or inadequate, Social Security Ruling ("SSR") 83-20 states that the ALJ should call a medical advisor." Diedrich, 874 F.3d at 638. However, "[SSR 83-20's] language does not expressly mandate that the ALJ consult a medical advisor in every case where the onset of disability must be inferred." Wellington, 878 F.3d at 874 (quoting Bailey v. Chater, 68 F.3d 75, 79 (4th Cir. 1995)).

The Ninth Circuit has found that the ALJ's obligation pursuant to SSR 83-20 to develop the record does not apply if, "despite some inadequacies in the record, 'a relatively complete medical chronology' of the claimant's condition during the relevant time period is available." Id. (citing Pugh v. Bowen, 870 F.2d 1271, 1278 & n.9 (7th Cir. 1989)). Notwithstanding a complete medical record, the available medical evidence should be considered "in view of the nature of the impairment" and "what medical presumptions can reasonably be made about the course of the condition." SSR 83-20, 1983 WL 31249, at *3. Thus, the disability onset date "should be set on a date when it is most reasonable to conclude from the evidence that the impairment was sufficiently severe to prevent the individual from engaging in SGA (or gainful activity) for a

continuous period of 12 months or result in death," and where a "[c]onvincing rationale [is] given for the date selected." Id.; see Wellington, 878 F.3d at 875 (citing SSR 83-20 and noting that the onset date should be set on the date when "an ALJ can reasonably and confidently say that no reasonable medical advisor could infer that the disability began during a period for which the claimant lacked medical documentation").

### 2. Evidence Prior to April 1, 2012

In determining that plaintiff was not disabled prior to April 1, 2012, the ALJ noted that plaintiff "was seen routinely by physicians at Kaiser Permanente since her amended alleged onset date in October 2009 for a variety of acute and chronic complaints" such as skin irritations, swollen glands, and a herpes outbreak. [AR at 21.] The ALJ then reviewed the records during that time period relating to each of plaintiff's severe impairments.

With respect to plaintiff's left carpal tunnel syndrome, the ALJ found that plaintiff "rarely, if ever, reported symptoms of carpal tunnel syndrome between the amended alleged onset date in October 2009, until May 2010, when she was seen by Manushak Amzoyan, M.D. for "persistent symptoms of left carpal tunnel syndrome." [Id.] Dr. Amzoyan noted that plaintiff was first seen for that condition in June 2009 and that significant clinical signs were found at that time. [Id. (citation omitted).] Plaintiff underwent a steroid injection in 2009 and her symptoms "got better significantly." [Id. (citation omitted).] In May 2010, Dr. Amzoyan recommended that plaintiff undergo left carpal tunnel release surgery, and she did so on May 25, 2010. [Id. (citations omitted).] After May 2010, plaintiff did not continue to report any left carpal tunnel symptoms. [Id.]

The ALJ next considered the records relating to plaintiff's diagnosis of lumbar degenerative disc disease. [Id.] She again noted that the medical evidence prior to the "established onset date" of April 1, 2012, was not consistent with disability. [Id.] According to the ALJ, plaintiff "rarely, if ever, reported symptoms of lower back pain and/or sciatica for nearly one year after her amended alleged onset date." [Id.] She notes that in October 2010, plaintiff was seen for complaints of radiating sciatic pain but, according to the ALJ, the clinical findings were minimal. [Id. (citations omitted).] Furthermore, plaintiff declined to attend physical therapy and, throughout 2011 (and

2012, and 2013), "rarely reported ongoing symptoms of lower back pain." [Id.]

With respect to plaintiff's anxiety disorder, the ALJ found that the "objective clinical findings . . . were simply not commensurate with disabling limitations prior to her established onset date of April 1, 2012." [Id. at 22.] She notes that in October 2010 plaintiff reported chest-related symptoms, but a cardiac examination and EKG were entirely normal, and her doctor believed her symptoms were related to her anxiety. [Id. at 22, 1600.] Plaintiff was prescribed Celexa in November 2010, which -- as she reported to her doctor in February 2011 -- she did not take because "people at the church" told her not to take either Celexa or Xanax [id. at 1600, 1631, 1640]; in August 2011 plaintiff reported to her new primary care physician that she was experiencing "significant family-related stress" due to financial issues, her son was suffering from end-stage liver disease, and a brother was suffering with cancer. [Id. at 22 (citing id. at 1791).] The August 9, 2011, treatment note also reflects that plaintiff was trying to enroll in college classes, needed a refill of her Xanax, and "[d]oesn't remember why she is not taking celexa as prescribed" in October 2010. [Id. at 1791.] That same note also reflects that on that date the doctor prescribed Xanax and Celexa. [Id.] In September 2011 plaintiff reported that the Xanax was helping but when she took Celexa she felt she had palpitations and stopped the medication right away. [Id. at 1809.] Plaintiff agreed to try Celexa again, beginning with just half a tablet. [Id.] In October 2011, plaintiff reported that she was a full-time student and that her anxiety medication was "working well," but also complained that it was making her extremely fatigued during the day. [Id. at 1931-32.] She asked the doctor whether she could try another medication "maybe with less side effect of fatigue." [Id. at 1931.] In November 2011 she "continued to report symptoms of depression due to her son's illness," but was not "nervous/anxious," and her medication was changed to Zoloft. [Id. at 22, 1941-42.] She reported in December 2011 that the Zoloft also made her sleepy. [Id. at 22, 1960.] The doctor reported at that time that plaintiff was "negative for depression," but was "nervous/anxious" and spent most of the visit "speaking about husband and son." [Id. at 1962.] The ALJ observed that "[t]here is very little evidence of any complaints of symptoms of anxiety [in the five-month period] between December 2011 and April 2012, [plaintiff's] established [disability] onset date." [Id. at 22.]

10

### 3. Evidence Beginning April 1, 2012

In determining plaintiff's date of disability to begin on April 1, 2012, the ALJ found that "beginning on April 1, 2012, [plaintiff's] allegations regarding her symptoms and limitations are consistent with the evidence." [AR at 23.] She noted that plaintiff's "musculoskelatal conditions" significantly worsened as of that date, but then summarized records relating to plaintiff's lower back pain dating from August *2013* through approximately April 2017, and records relating to plaintiff's cervical neck pain dating from approximately February 7, *2016*, through August 14, 2017, to support that position. [Id. at 23-24 (citations omitted).] For instance, the ALJ noted that in January *2013* plaintiff reported radiating lower back pain and was prescribed Norco, although she did not report symptoms again until July 2013. [Id. (citations omitted).] With respect to plaintiff's cervical degenerative disc disease, the ALJ noted a *2016* MRI showing multilevel cervical spinal stenosis; epidural steroid injections administered in November *2016* and March *2017*; and cervical spinal surgery on April 27, *2017*. [Id. at 24 (citations omitted).] After the surgery, plaintiff continued to report "constant bilateral upper extremity numbness" in her hands. [Id.] These records do not support the ALJ's conclusion that April 1, 2012, was the date that plaintiff became disabled.

With respect to plaintiff's mental health, the ALJ also specifically found that plaintiff's mental impairments "worsened in April 2012." [Id. at 24.] According to the ALJ, on April 25, 2012, plaintiff reported anxiety "due to the loss of several family members" and complained of heart pain [id. at 2142]; on April 27, 2012, she appeared "very anxious" about her heart pain and requested a treadmill test, for which the results were normal [id. at 2188-89]; on May 5, 2012, she was seen in the emergency department complaining of numbness, spasms, a racing heartbeat, and feeling like there was a clot in her heart; she exhibited rapid, highly pressured, and tangential speech [id. at 2230-40]; her treating physician recommended on May 11, 2012, that plaintiff seek treatment with a psychiatrist due to her "many somatic symptoms" [id. at 2335-36]; on May 16, 2012, she was described as agitated with inappropriate judgment, and irrational with erratic behavior, and exhibited highly pressured speech [id. at 2376]; also on May 16, 2012, the examiner reported that that she could not "get in a word without asking" plaintiff to stop talking and that plaintiff "appears

acutely manic and possible [sic] gravely disabled," and refused to listen to any explanation for her symptoms "other than her own" [id. at 2380]; and on May 17, 2012, plaintiff reported that her husband had been "monitoring her" and that he had "attempted to feed her broken glass" [id. at 2383.] On May 17, 2012, plaintiff was diagnosed with mood disorder, not otherwise specified, and a rule-out diagnosis of bipolar disorder, as well as panic disorder, and history of personality disorder. [Id. at 2385.] The ALJ noted that plaintiff stabilized "briefly," but at some point she stopped taking her psychoactive medications, and "sought medical treatment for various and ambiguous symptoms, several times a month since 2013." [Id. at 24.] For instance, the ALJ stated that plaintiff reported throat problems a few weeks after becoming a vegetarian; ear pain due to getting a flea in her ear; various rashes and skin irritations; and multiple concerns "largely unfounded about bed bugs or fleas." [Id. (citing id. at 2019-20, 2502-03, 2889, 2921, 2952, 2968-69).] At a June 4, 2013, treatment visit, plaintiff also was reported to appear to be in a manic state and had not been taking her Risperdol. [Id. at 2968-69.] The ALJ noted similar treatment notes from August 2013 through 2015, reporting skin complaints, concerns about bedbugs, anal skin tags, herpes, spider bites, and tongue swelling. [Id. (citations omitted).] The ALJ concluded that plaintiff's mental impairments were disabling "as of, but not before, April 1, 2012," and, as "wholly supported by the objective medical evidence," her "conditions were documented to have significantly worsened as of that date." [Id. at 25.]

### 4. Discussion

Plaintiff argues that her medical records show a primary diagnosis of "panic disorder" in October 2010; that anxiety diagnoses and symptoms were noted throughout the end of 2010, and throughout 2011; and that in November 2011 she was also diagnosed with depression. [JS at 5-6.] She notes that the records in 2010 and 2011 describe her as "nervous/anxious." [Id. at 5 (citing AR at 1576, 1577).] She explained to her providers in November 2010 that taking Celexa made her tired, and she tried taking Xanax "but it made her feel like a zombie." [Id. at 6 (citing AR at 1593).] Plaintiff states that in March 2011, she "began taking the medication for anxiety consistently." [Id. (citing AR at 1674, 1697, 1760-61).] Plaintiff contends that the ALJ's

12

determination that she has been disabled as of April 1, 2012, "but not prior thereto, particularly not prior to her DLI of *December 31, 2011*, was arbitrary and contrary to the substantial evidence of record." [JS at 2 (emphasis in original).] She argues that because the evidence regarding her disability onset date is not clear from the medical evidence, the ALJ erred when she failed to procure the assistance of a medical expert to make that determination. [Id. at 6.]

Defendant responds that the ALJ properly found that plaintiff's anxiety disorder and related heart palpitations were severe impairments before and after plaintiff's DLI, and also properly found that the objective clinical findings regarding plaintiff's mental health limitations "were simply not commensurate with disabling limitations" prior to April 1, 2012. [Id. at 9 (citing AR at 19, 22).] Defendant summarizes the same pre-April 2012 evidence cited to by the ALJ and then summarizes the post-April 2012 evidence cited to by the ALJ as evidence of plaintiff's worsening conditions. [Id. at 9-10 (citations omitted).]

While the post-April 1, 2012, medical records relating to plaintiff's mental health condition arguably reflect a worsening of her mental condition, one of the problems with the ALJ's determination of April 1, 2012, as plaintiff's onset date is that the records cited to by the ALJ do not reflect significant differences in plaintiff's pre-April 1, 2012, and post-April 1, 2012, mental health diagnoses and complaints.[7]

In this case, the ALJ's conclusion that plaintiff's disability onset date commenced on April 1, 2012, was not obvious from the medical records. That is, while the medical record is voluminous and there does not appear to be any significant gap in the records, there also does not appear to be any specific treatment record or records dated on or about April 1, 2012, that reflect a treating provider's opinion that plaintiff was disabled due to her mental impairments, symptoms or limitations as of that date. Indeed, the treatment note closest in time to April 1, 2012, only states as follows:

---

[7] The Court notes that plaintiff does not appear to be arguing that her physical impairments alone were disabling prior to April 1, 2012. In fact, the ALJ's discussion of the records relating to plaintiff's allegedly worsening physical impairments (i.e., her degenerative disc disease of the cervical and lumbar spines) after April 1, 2012, began with a discussion of an August 2013 record reflecting "worsening lower back pain" -- more than 16 months after April 1, 2012.

13

> Patient here for anxiety, recently l[o]st several family members. Patient states she went to get her marijuana license and told BP[] elevated. Patient treated for HTN in past, last took in 2009 (took for 3 months). Patient would like BP medications. Patient states that she has chronic chest pressure typically associated with her anxiety. Typically has nausea, palpitations, sweating -- which she experienced today. Patient has multiple social issues. She is not seeing a therapist or psychiatry.

[AR at 24 (citing id. at 2142).] The provider recommended "stress relief and seeking behavioral medicine evaluation." [Id. at 2142.] The ALJ then cited to an April 27, 2012, treatment note relating to an exercise stress test administered at plaintiff's request due to plaintiff's history of "anxiety [with] worsening 'heart pain' x2 months; feels chest pressure all the time, believes she has blockage in her heart." [Id. at 2188.] Plaintiff was noted to be "very anxious" and her symptoms were described as vague. [Id. at 2189.] Her EKG and exercise stress test were normal. [Id.] The ALJ summarized a few other May 2012 treatment notes, including a May 11, 2012, note reflecting that plaintiff's primary care physician had "recommended" psychiatric treatment. [Id. at 24.] A review of that note reflects that plaintiff had "multiple somatic complaints" with her primary worry "being something [was] wrong with [her] heart," and the physician's notation that although plaintiff denied "primary anxiety," she was "willing to [go to] psychiatry re: anxiety caused." [AR at 2336.] Then, on May 17, 2012, plaintiff presented at Kaiser Permanente and was evaluated by the "Psychiatric Emergency Team." [Id. at 2383-92.] At that visit she reported that the day before she had been evaluated in the emergency department for her anxiety, specifically her belief that she was having clots in her heart and was going to die. [Id. at 2383.] Plaintiff was described as "quite hyper-verbal, tangent[i]al, anxious, and quite distractible." [Id.] The evaluators concluded that "this is a psychiatric problem manifesting in somatic complaints." [Id.] Plaintiff's daughter, who accompanied her to the emergency room, stated that plaintiff's family had made many appointments with Kaiser Permanente psychiatry, but that plaintiff either "no shows or cancels them." [Id.] It was indicated that plaintiff was a "very poor reporter due to her hyper-verbal and extreme anxiety"; gave hints of paranoia throughout her presentation; believed that her husband had been monitoring her by bugging her phones; and stated that when she and her husband were breaking up "he made her a tuna sandwich, broke a glass," and "on the second bite she found a shard of glass in the sandwich." [Id.] The report also indicated that plaintiff has a

history of excessive spending, including feeding friends and buying them things "over the past 2 1/2 years" (i.e., since approximately December *2009*), even when she had no income. [Id.] Plaintiff responded to the evaluators' "[s]imple questions . . . with rapid, long, and convoluted stories straying from the question, and "states she is goal directed, and yet sounds like she accomplishes very little." [Id. at 2384.] After summarizing these records, the ALJ observed that since 2013 plaintiff had consistently sought medical treatment for "various and ambiguous" symptoms. [Id. at 24-25 (summarizing several mental health treatment notes between 2013 and 2017).]

As in Armstrong, the evidence in this case demonstrates that plaintiff suffered from various mental impairments prior to her DLI of December 31, 2011. See Armstrong, 160 F.3d at 589.[8] The ALJ concluded that plaintiff's disability onset date was April 1, 2012, based on plaintiff's "worsening" condition, but provided neither a legitimate medical basis nor a convincing rationale for selecting that date over any other.[9] Moreover, although the ALJ stated that there was little evidence of mental health treatment between December 2011 and April 2012, the record shows that during that time period she had a December 12, 2011, follow-up appointment for her anxiety [id. at 1960]; was seen for recurrent right lateral epicondylitis for which she had received "repeat injections" and attended occupational therapy sessions [see id. at 1987-2006, 2117]; underwent mammogram screening; and was seen for complaints of trouble swallowing, which she attributed to her newly-implemented vegetarian diet and lack of red meat. [Id. at 2020, 2075.] Additionally, the ALJ noted plaintiff was a "full-time student" in October 2011, but plaintiff testified at the hearing -- seeming very confused about the dates she attended and the classes she took -- that she only attended school for one to two semesters, took two English classes, a guitar class, a piano class,

---

[8] In Armstrong, the ALJ denied plaintiff's application for DIB after finding him not disabled as of his DLI, but granted plaintiff's application for SSI payments, finding that he had been disabled since August 9, 1994. Armstrong, 160 F.3d at 589. This result is similar to the one herein.

[9] To the extent the ALJ determined plaintiff's date of disability to be April 1, 2012, based on the ALJ's finding that "beginning on April 1, 2012, [plaintiff's] allegations regarding her symptoms and limitations are consistent with the evidence," this did not provide a "legitimate *medical* basis" for selecting that date. [AR at 23.]

and a math class, and that she failed the math and piano classes. [Id. at 22, 750-56.] Although, as the ALJ characterized it, plaintiff's mental health condition appeared to be "worsening" as of April 2012, the Court cannot assume -- based on just a four-month period between December 2011 and April 2012 where there is little mention of mental health complaints in the record -- that plaintiff's well-documented mental health impairments prior to December 2011 were not already disabling sometime prior to April 1, 2012. Because "[m]ental disorders may manifest themselves over a period of time[,] . . . the precise date of onset of a disabling psychological impairment may be difficult, or impossible to ascertain, and the services of a specialist may be necessary to infer the onset date." Morgan v. Comm'r of the Soc. Sec. Admin., 945 F.2d 1079, 1081 (9th Cir. 1991); see also Nguyen v. Chater, 100 F.3d 1462, 1465 (9th Cir.1996) (stating "depression is one of the most underreported illnesses in the country because those afflicted often do not recognize that their condition reflects a potentially serious mental illness"). In this case, the ALJ provided neither a legitimate medical basis nor a convincing rationale for selecting April 1, 2012, as the disability onset date over any other prior to that date. Additionally, the error was not harmless because the ALJ's decision was determinative of whether plaintiff was entitled to DIB. Because the record is ambiguous as to when plaintiff's severe mental impairments (alone or in combination with her physical impairments) became disabling, the ALJ should have consulted with a medical expert to make that determination.

Remand is appropriate so that the ALJ can "create a record which forms a basis for th[e] onset date." Armstrong, 160 F.3d at 590. The ALJ can fulfill this responsibility "by calling a medical expert . . . to determine the onset date." Id.

### B. SUBJECTIVE SYMPTOM TESTIMONY

Plaintiff argues that the only reason given by the ALJ for rejecting plaintiff's testimony was because that testimony was not supported by the objective medical evidence. [Id. at 17.] She argues that the medical evidence in fact was consistent "in material respects with [her] testimony regarding her subjective symptoms and functional limitations prior to April 1, 2012." [Id.] Additionally, she submits that the ALJ rejected plaintiff's allegations "*solely* on the basis of lack of

objective corroborating evidence, and failed to provide any other specific, clear and convincing reasons for rejecting her allegations . . . *prior to April 1, 2012*." [Id. (citations omitted).]

Defendant responds that in addition to the lack of objective evidence, the ALJ also based her determination to discount plaintiff's testimony on the fact that plaintiff received conservative treatment to control her pain, the fact that her carpal tunnel syndrome improved after surgery, the fact that clinical examinations did not support plaintiff's complaints of back pain, and because plaintiff's statement that she was a full-time student in October 2011 was inconsistent with her testimony of disabling limitations. [Id. at 21 (citations omitted).]

While a lack of objective medical evidence supporting a plaintiff's subjective complaints cannot provide the only basis to reject a claimant's subjective symptom testimony (Trevizo v. Berryhill, 871 F.3d 664, 679 (9th Cir. 2017) (quoting Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006))), it is one factor that an ALJ can consider in evaluating symptom testimony. See Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor the ALJ must consider in his credibility analysis."); SSR 16-3p, 2017 WL 5180304, at *5 ("objective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms, including the effects those symptoms may have on the ability to perform work-related activities for an adult"). "The intensity, persistence, and limiting effects of many symptoms can be clinically observed and recorded in the medical evidence. . . . These findings may be consistent with an individual's statements about symptoms and their functional effects. However, when the results of tests are not consistent with other evidence in the record, they may be less supportive of an individual's statements about pain or other symptoms than test results and statements that are consistent with other evidence in the record." SSR 16-3p, 2017 WL 5180304, at *5. As the Ninth Circuit recently held, "an ALJ's 'vague allegation' that a claimant's testimony is 'not consistent with the objective medical evidence,' without any 'specific finding in support' of that conclusion, is insufficient." Treichler, 775 F.3d at 1103 (citation omitted) (the "ALJ must identify the testimony that was not credible, and specify 'what evidence undermines the claimant's complaints.'"); Brown-Hunter v. Colvin, 806 F.3d 487, 493-94 (9th Cir. 2015) (the ALJ must identify

the testimony she found not credible and "link that testimony to the particular parts of the record" supporting her non-credibility determination). Additionally, "[l]ong-standing principles of administrative law require [this Court] to review the ALJ's decision based on the reasoning and factual findings offered *by the ALJ* -- not post hoc rationalizations that attempt to intuit what the adjudicator may have been thinking." Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1225-26 (9th Cir. 2009) (emphasis added) (citation omitted).

Because the matter is being remanded to obtain testimony from a medical expert as to plaintiff's disability onset date, and that determination may impact the ALJ's consideration of plaintiff's subjective symptom testimony, the ALJ must also reconsider on remand, pursuant to SSR 16-3p, plaintiff's subjective symptom testimony and provide specific, clear and convincing reasons for discounting plaintiff's subjective symptom testimony, if warranted.

## **VI.**

## **REMAND FOR FURTHER PROCEEDINGS**

The Court has discretion to remand or reverse and award benefits. Trevizo, 871 F.3d at 682 (citation omitted). Where no useful purpose would be served by further proceedings, or where the record has been fully developed, it is appropriate to exercise this discretion to direct an immediate award of benefits. Id. (citing Garrison, 759 F.3d at 1019). Where there are outstanding issues that must be resolved before a determination can be made, and it is not clear from the record that the ALJ would be required to find plaintiff disabled if all the evidence were properly evaluated, remand is appropriate. See Garrison, 759 F.3d at 1021.

In this case, there is an outstanding issue that must be resolved before a final determination can be made. In particular: on remand, the ALJ shall call a medical advisor or expert to testify -- based on all of the medical evidence of record, including, but not limited to, the June 2016 medical source statement from plaintiff's treating physician at Kaiser Permanente, Dr. Kim,[10] who opined

---

[10] The ALJ discounted Dr. Kim's June 2016 opinion [AR at 5164-72] because she "did not begin treating [plaintiff] until well after her established onset date." [AR at 25.] However, in
(continued...)

that plaintiff could "no longer work on a full time basis" since 2011 [AR at 5164-68] -- regarding whether plaintiff's disability onset date was sometime prior to April 1, 2012.[11] The ALJ may also reconsider on remand, pursuant to SSR 16-3p, plaintiff's subjective symptom testimony, and provide specific, clear and convincing reasons for discounting plaintiff's subjective symptom testimony, if warranted.

/
/
/
/
/
/
/
/
/
/
/
/

---

[10](...continued)
addition to being reflected on an April 26, 2012, Kaiser Permanent treatment record as plaintiff's primary care physician ("PCP"), Dr. Kim is also reflected on several other Kaiser Permanente records as plaintiff's PCP well *prior* to April 1, 2012, as well as prior to December 31, 2011, her date last insured. [See, e.g., id. at 1707 (April 22, 2011), 1747 (June 5, 2011), 2019 (March 13, 2012).] Moreover, as noted by plaintiff, "as a Kaiser Permanente physician, Dr. Kim had access to all of Plaintiff's medical records which pre-dated her initial treatment of Plaintiff, and it is reasonable to assume that as a treating physician, Dr. Kim had reviewed all necessary medical records available to her." [JS at 5.]

[11] Nothing herein is intended to disrupt the following: (1) the ALJ's finding that plaintiff was disabled **at least as of April 1, 2012**; and (2) the ALJ's step four finding that plaintiff is unable to perform her past relevant work as a home attendant, and in the composite job of swimming pool servicer and sales clerk. Additionally, the ALJ's determination of plaintiff's severe impairments and RFC before and after her disability onset date must continue to reflect **at least** the severe impairments and RFC limitations found by the ALJ in the March 9, 2018, decision. [Id. at 26.]

19

## VII.

## CONCLUSION

**IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **granted**; (2) the decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for further proceedings consistent with this Memorandum Opinion.

**IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the Judgment herein on all parties or their counsel.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED: February 11, 2020

_____
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE